IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:20CR316 |
| vs. | |
| THOMAS J. TROUBA, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress ([Filing No. 32](Filing No. 32)). An evidentiary hearing was held regarding the motion on June 9, 2021 and a transcript has been filed. This matter is now ripe for disposition.

For the reasons explained below, the motion will be denied.

## FACTS

Deputy Michael DeChellis ("Deputy DeChellis") is a criminal investigator with the Douglas County Sheriff's Office. (TR. 8.) Deputy DeChellis has been with the Sheriff's Office for thirteen to fourteen years. (TR. 8.) On September 18, 2020, while working at the Sheriff's Office's west office, he became aware of a bomb threat at the Douglas County Courthouse (the "Courthouse"), which is located at 1701 Farnam Street, Omaha, Nebraska. (TR. 9.) Deputy DeChellis testified that once the scene was secure, law enforcement decided to bring in an investigator. Deputy DeChellis, as a criminal investigator, was then directed to go to the Courthouse by his supervisor. (TR. 10.) He arrived approximately an hour and a half after the boxes were placed on the sidewalk. (TR. 21-22.)

Deputy DeChellis testified that he arrived at the Courthouse around 4:15 p.m. and that Deputy Adam Marcotte ("Deputy Marcotte") met him at the Courthouse. (TR. 10.) Deputy Marcotte is an investigator with the Douglas County Sheriff's Office and investigates international terrorism crimes with the Federal Bureau of Investigation ("FBI"). (TR. 41.) Deputy Marcotte has been with the Sheriff's Office for approximately sixteen years and has been an investigator for four years. (TR. 41.) Deputy Marcotte testified he arrived at the Courthouse around 4:00 p.m. (TR. 42.)

When Deputy DeChellis arrived at the Courthouse, he was told that a deputy on foot patrol had located two U.S. Postal Service boxes set alongside the curb outside the southeast service entrance of the Courthouse. (TR. 10.) Deputy DeChellis testified that when he arrived at the Courthouse, there had been no official determination as to whether the boxes contained bombs or were a threat. (TR. 10.) The Omaha Police Department bomb squad was on scene and was following its procedures to evaluate the situation. (TR. 10-11.)

At the Courthouse, Deputy DeChellis was advised that the building security staff had been reviewing video footage and had determined the individual who placed the packages had long hair. (TR. 10-11.) Deputy DeChellis was escorted to the control center of the Courthouse to view the video footage. (TR. 10.) The Courthouse security officers, who are familiar with the Courthouse's camera systems, were able to see the individual who placed the packages and when the individual did so. (TR. 11.) The videos reflect the boxes were placed on the sidewalk on the back side of the Courthouse, by the service entrance, at approximately 2:15 p.m.. (TR. 43.) The security officers were able to backtrack the cameras to trace the individual's movements in and around the Courthouse. (TR. 11; Ex. 1.) By doing so, investigators determined that the individual who placed the boxes had been in court and paid a traffic fine in the Courthouse earlier that day. (TR. 11, 13-14.)

The government's Exhibit 1, which was offered at the evidentiary hearing, is video of the interior and exterior of the Douglas County Courthouse. Exhibit 1, Video No. 8,[1] is a 360-type video-camera overview of the exterior of the Courthouse on the south side. (Ex. 1.8.) The video shows an individual on the top of the screen come down the stairs of the Courthouse, climb up on

---

[1] Exhibit 1 contains eleven separate videos. The video number will be identified behind the decimal point in the citation. For example, 1.8, refers to Video No. 8 of Exhibit No. 1.

the railing of the stairs, get back on the stairs, and then come down to ground level. (TR. 18; Ex. 1.8.) The video then shows the individual push over a no smoking sign. (TR. 18; Ex. 1.8.)[2] The video footage also shows a black Acura RDX parked around 18th and Harney—just south of the Courthouse on 18th Street.[3] (TR. 20; Ex. 1.) After the individual shown on the video pushed down the no smoking sign, the individual walked to the RDX, spent a minute or so doing something in the back passenger seat on the driver's side of the RDX, and then pulled out. (TR. 20; Ex. 1.10.) The individual then stopped the RDX in the intersection, got out and did something else in the back-passenger area on the driver's side very briefly, and then got back in the vehicle and turned east onto Harney street. The individual continued east on Harney street and pulled up to the sidewalk in front of the service entrance of the back of the Courthouse. (TR. 20; Ex. 1.10.) Video No. 11 of Exhibit No. 1 is looking down the sidewalk of the back of the Courthouse. After the individual in the RDX pulled up to the sidewalk, he slightly opened the driver's door and then appeared to wait for an individual walking on the sidewalk to pass by. (Ex. 1.11.) Once the person walking on the sidewalk passed the RDX, the individual got out and opened the back passenger door on the driver's side and retrieved two packages, which the individual then neatly placed side by side on the sidewalk outside the Courthouse. The individual then returned to the RDX, and drove away. (TR. 20; Ex. 1.11.) The individual crossed three lanes of travel on Harney street, turning south onto 16th Street. (Ex. 1.10 and 1.11.)

Deputy DeChellis testified that the boxes placed on the sidewalk outside of the Courthouse were those that set off the bomb threat situation. (TR. 21.) The boxes were unmarked, shipping-sized boxes that were around the size of boxes used for shipping books or something in that size range. (TR. 21.) The boxes were closed so you could not see inside of them. (TR. 21.) Deputy DeChellis testified that Deputy Smolen, the deputy who came across the boxes while on foot patrol, immediately recognized that the boxes sitting outside were suspicious. (TR. 21.) Deputy Smolen looked at the boxes and noticed there were no markings to indicate who they were from or where they were intended to go. (TR. 21.) There was no one around to explain how the boxes had gotten there and they did not appear to have been thrown out as trash because they were neatly

---

[2] Additional video exhibits could not be played during the evidentiary hearing due to technology issues. However, Deputy DeChellis was able to testify as to what was captured on the videos and the Court reviewed the videos following the hearing and before issuing this Findings and Recommendation.

[3] Deputy DeChellis testified that he believed the vehicle was parked on 18th and Farnam. However, review of the footage shows the vehicle was actually parked on 18th and Harney. (TR. 20; Ex. 1.9.)

3

set in a position where they could be found outside the doorway. (TR. 21.) Deputy Smolen brought his supervisor down to the area and they decided that the situation was that of a potential bomb threat. (TR. 21.)

Deputy DeChellis testified he was responsible for identifying the suspect in the video footage who placed the boxes. (TR. 13; TR. 15.) Deputy DeChellis stated that by using the information from the video and talking with courthouse deputies, he identified Defendant as the suspect in the video. (TR. 13; TR. 15.) Deputy DeChellis testified that to do so, he either took a still shot of the video footage on his phone or printed color photos of screen shots from the video, and then showed the photos to courthouse deputies who had been working that day. (TR. 13.) When Deputy Harold Ohlinger ("Deputy Ohlinger") viewed the photos, he recognized the individual in the photos as someone who had been in the courtroom for traffic court that day. (TR. 13-14.) Deputy Ohlinger did not know the individual's name but told Deputy DeChellis he recognized the individual because the individual had been disruptive in court and had very long hair. (TR. 13-14.) Deputy Ohlinger also remembered that the individual's attorney's name was Mr. Petersen. (TR. 14.) One of the other deputies contacted Mr. Peterson to get the individual's name. (TR. 14.) Deputy Ohlinger also contacted Judge Stephanie Shearer ("Judge Shearer"), who had been assigned to traffic court that day. (TR. 14.) Based on the description Deputy Ohlinger gave to Judge Shearer, she was able to recognize who was being described to her—due to the unpleasant interaction she had with the individual in court that day—and was able to provide a name to Deputy Ohlinger. (TR. 14.)

After Deputy DeChellis learned the suspect's name, deputies pulled up a Nebraska Criminal Justice Information System ("NCJIS") photo of Defendant. (TR. 15.) The NCJIS is the Nebraska information system that retains driver's license photos, booking photos, etc.. (TR. 15.) From that, officers determined Defendant was visually consistent with the suspect shown in the video. (TR. 15.) They also determined Defendant had a black Acura RDX registered to him, which is the same model of vehicle the individual who placed the boxes outside the Courthouse had been driving. (TR. 15-16.)

Once officers identified Defendant as the suspect shown in the video, Deputy DeChellis remained at the Courthouse to oversee the scene. (TR. 22.) Deputy DeChellis was present when the bomb squad detonated the packages. (TR. 22.) Before the packages were detonated, Deputy

DeChellis was able to speak to Defendant's lawyer, Mr. Petersen. (TR. 23-24.) Deputy DeChellis advised Mr. Petersen that Defendant was going to be arrested for terroristic threats at a minimum. (TR. 23.) Mr. Petersen then spoke to Defendant and called Deputy DeChellis back and told him that the boxes were empty with maybe some packaging inside. (TR. 24.) Mr. Petersen indicated he had plans that night and was trying to negotiate for Defendant to turn himself in the next day. (TR. 24.) Deputy DeChellis testified this was not an option for law enforcement at that point given the level of response that had been generated. (TR. 24.)

Deputy Marcotte testified he was not involved in the process of identifying Defendant as the suspect, but later performed some database checks to get Defendant's address. (TR. 43.) Deputy Marcotte stated he decided to go to 13475 Elm Circle, which he identified as one of Defendant's potential addresses, to conduct surveillance to locate Defendant. (TR. 22; TR. 44-45.) Deputy Marcotte testified he believed Defendant was driving a black Acura based on the information he believed he received from Deputy DeChellis. (TR. 22; TR. 44-45.) At the time, Deputy Marcotte was dressed in plainclothes and driving an unmarked vehicle. (TR. 44.)

Deputy Marcotte testified that when he arrived at the residence on Elm Circle, he did not observe an Acura, but saw a black Dodge Dart parked along the street right outside the residence. (TR. 45.) Deputy Marcotte stated that three minutes after he arrived at the residence, he observed a silver or gray F-150 pull up and back into the driveway. (TR. 45.) Deputy Marcotte then observed a white male and female exit the F-150 and hurriedly move in and out of the residence removing black totes and duffle bags from the residence and placing them in the F-150. (TR. 46.) Deputy Marcotte testified that the male and female continued to remove items from the residence for approximately fifteen minutes. (TR. 46.) Deputy Marcotte testified that he was concerned that the male and female were loading explosives into the F-150 or something related to that because it was unclear what was happening at the time. (TR. 47.) Deputy Marcotte also testified that the male and female could have also been loading drugs or possibly something totally innocent. (TR. 56.) After watching the male and female for around fifteen minutes, Deputy Marcotte contacted uniform patrol deputies for assistance and let them know there was some suspicious activity occurring and that the suspect from the Courthouse incident was possibly at the residence. (TR. 46; TR. 48.)

Douglas County Sheriff's Deputy Ken Paulison ("Deputy Paulison") and Douglas County Sheriff's Deputy Andrew Berkshire ("Deputy Berkshire") were the uniform patrol deputies working in marked cruisers that day who responded to Deputy Marcotte's call. (TR. 46; TR 48; TR. 82.) Deputy Paulison conducts road patrol for the Sheriff's Office and has been employed there for twenty-three years. (TR. 63-64.) Before that, Deputy Paulison worked as an Elkhorn police officer for six years. (TR. 64.) Deputy Paulison testified that he was the acting sergeant for his crew that day because the supervisor was gone. (TR. 64.) Deputy Berkshire is a road patrol deputy and takes calls for service and makes traffic stops. (TR. 83.) Deputy Berkshire has been with the Sheriff's Office for two years. (TR. 83.)

Deputy Marcotte testified that the male and female left the residence about a half hour after they got there. (TR. 46.) When they left, the male was driving the F-150 and the female was following behind the F-150 driving the Dodge Dart. (TR. 47.) When the F-150 drove by Deputy Marcotte, who was positioned near the residence on 134th Avenue, Deputy Marcotte was able to identify the male as Defendant. (TR. 47.) Deputy Marcotte testified that he then advised uniform patrol that he believed the male in the F-150 was the suspect wanted in the bomb incident and should be stopped. (TR. 47.) Deputy Marcotte testified that when he first observed Defendant at the residence, he was unable to make a positive identification because the suspect depicted in the video had long hair, and it appeared the male he was observing had short hair. However, when Defendant drove by him, Deputy Marcotte saw his hair was actually tied up on top of his head. (TR. 48.) Deputy Marcotte, with the help of Deputy Paulison and Deputy Berkshire, also ran the plates on the F-150 and determined the F-150 was registered to Defendant. (TR. 48.) Deputy Marcotte testified he did not know whether Defendant had a criminal record at the time, but that he had probable cause to arrest Defendant once he identified him. (TR. 56.)

Deputy Marcotte followed the F-150 and Dart as they left the residence. (TR. 48.) He observed them head north on 134th Avenue, and then cut to the east—staying south of West Center Road. (TR. 48.) Then, they cut north directly across Center Street into a strip mall parking lot just north of Center on 132nd Circle. (TR. 48.) They then parked in the parking lot. (TR. 48.) Deputy Marcotte testified he maintained his distance and communicated with Deputy Paulison and Deputy Berkshire to let them know what he was observing and what was going on. (TR. 49.) Deputy Marcotte testified he was positioned about 50 yards away parked in a different area. (TR. 49.) At

6

that point, the male, who Deputy Marcotte then believed to be Defendant, exited the F-150 and began working on the tailgate of the vehicle. (TR. 49.) Deputy Marcotte testified it appeared Defendant had a case and maybe a ratchet set, but that it appeared Defendant was using tools on the tailgate. (TR. 49.) The female stayed in the Dart. (TR. 49.)

Deputy Marcotte was positioned in the area for less than five minutes when Deputy Paulison and Deputy Berkshire arrived. (TR. 50.) Deputy Berkshire testified Deputy Paulison arrived before he did. (TR. 85.) Shortly before Deputy Berkshire arrived, Deputy Paulison made contact with Defendant and the female. (TR. 50; TR. 85.) Deputy Paulison testified that when he got to the parking lot, the F-150 was stopped and he saw a male and a female standing outside the back of the F-150. (TR. 66.) Paulison testified the male had a toolbox and was working on the bed of the F-150. (TR. 66.) Deputy Paulison stated that at that point, he knew Defendant was a suspect in the bomb situation at the Courthouse and that Deputy Marcotte had asked him to stop the F-150 to identify the driver. (TR. 66.) Deputy Paulison testified he had been instructed to detain Defendant based on the bomb investigation. (TR. 67.)

Deputy Paulison testified that he pulled his patrol car behind Defendant and activated the lights on his patrol car to start the camera. (TR. 66-67.) Deputy Paulison stated he then exited his patrol car and that Defendant turned towards him and said everything was fine and that he was not having vehicle problems. (TR. 67.) Deputy Paulison told Defendant he understood his vehicle was fine, but that he needed to identify him. (TR. 67.) Defendant then grabbed his wallet and produced his identification. (TR. 67.) Deputy Paulison testified that once he identified Defendant, he detained him and placed Defendant in handcuffs. (TR. 67-68; TR. 85.) Deputy Paulison said he initially told Defendant he was being detained for the bomb investigation,[4] but that Defendant was later advised he was under arrest. (TR. 67; TR. 85; Ex. 2.) Deputy Paulison testified the female, who was identified as Ms. Gillett, was also detained and searched. (TR. 70.) After Defendant was handcuffed, he was placed in Deputy Berkshire's patrol car. (TR. 68; TR. 85.) Deputy Paulison

---

[4] At the hearing, Defendant's counsel stated in his argument that the Court would hear on the video Deputy Paulison tell Defendant he was under arrest when he placed Defendant in handcuffs. (TR. 108.) The video does not have sound until after Defendant was approached and put in handcuffs. Therefore, there is no audio as to whether Deputy Paulison told Defendant he was being detained or was under arrest at that point. (Ex. 2.)

7

testified that Defendant never made any statements and that officers did not question him. (TR. 70.)

Deputy Marcotte testified that he walked down to Deputy Paulison after Deputy Paulison had asked Defendant and Ms. Gillett for identification. (TR. 50.) Deputy Marcotte testified Deputy Paulison told him he recognized Defendant immediately from a DMV photo. (TR. 50.) Deputy Berkshire testified that he also made an independent identification of Defendant based on Defendant's driver's license photo. (TR. 87.) Deputy Marcotte testified he let Deputy Paulison make the identification for safety purposes because Deputy Marcotte was not wearing his vest. (TR. 50.) Deputy Marcotte testified he did not have any contact with Defendant at the scene other than just being present when Deputy Paulison placed Defendant in handcuffs. (TR. 50.)

Deputy Paulison testified that after Defendant was in the patrol car, officers contacted other supervisors and individuals involved in the investigation of the bomb threat downtown. (TR. 68.) Deputy Paulison stated that officers on the scene did not have a whole lot of information from downtown at that point. (TR. 68.) However, Deputy Paulison testified he was aware that Defendant and Ms. Gillett had been observed loading boxes and bags into the truck and that there was a bomb threat situation. (TR. 69.) Officers determined a bomb dog should come to the scene to check the F-150 to make sure it did not contain explosives. (TR. 68-69.) Deputy Marcotte also testified that officers called a bomb dog to the scene to sniff the F-150 because they were concerned about what was in the vehicle. (TR. 51.) Deputy Paulison testified he contacted the bomb squad to bring a bomb dog to the scene. (TR. 68.)

Deputy Paulison stated it took quite some time for the bomb dog to arrive. (TR. 51.) Deputy Paulison and Deputy Marcotte each testified that while they waited for the dog, officers walked around the F-150 and conducted a plain view look inside the passenger compartment of the vehicle. (TR. 51; 69-70.) Deputy Paulison testified there was a tonneau cover on the bed of the truck that was closed. (TR. 70.) Deputy Marcotte testified that one of the windows of the F-150 was down so he could smell the odor of marijuana coming from the passenger side of the F-150. (TR. 51.) Deputy Paulison testified he did not personally smell marijuana because he did not walk to that side of the F-150. (TR. 81.) Deputy Berkshire testified he also did not smell marijuana because he does not have a good sense of smell, but that he was aware that another deputy had smelled marijuana coming from the F-150. (TR. 86-87.)

8

Deputy Marcotte also testified that while peering inside the F-150, he observed a cardboard box on the driver's side seat with a large amount of U.S. currency in rubber banded bundles. (TR. 51.) Deputy Paulison likewise testified he saw a box sitting on the front seat with a large amount of currency. (TR. 70.) Deputy Paulison also testified he could see backpacks, large black duffle bags, and some containers inside the F-150. (TR. 70.) Deputy Marcotte testified that, based on his training and experience, a large amount of money is an indication that there could be drugs in the vehicle, but that because of the bomb situation, officers did not know if there was also going to be explosive devices. (TR. 51-52.) Deputy Paulison also testified that, based on his training and experience, the odor of marijuana indicated there might be some illegal narcotics in the vehicle. (TR. 71.)

While he was at the Courthouse, Deputy DeChellis was kept up to speed by other officers about developments with Defendant. (TR. 26.) Deputy DeChellis testified that Deputy Marcotte called him after officers made contact with Defendant. (TR. 24.) Deputy DeChellis testified he was told that Defendant was in the back of a cruisier and that Defendant had identified himself. (TR. 26.) Deputy Marcotte also told Deputy DeChellis over the phone that Defendant might have a significant amount of money and drugs in the F-150. (TR. 27.) Deputy DeChellis testified that Deputy Marcotte additionally told him about the duffle bags, etc. being frantically loaded into the F-150 from the Elm Circle address. (TR 27.) Deputy DeChellis testified he does not know at exactly what point the deputies determined they had Defendant or that Defendant was the party law enforcement was looking to arrest. (TR. 26.) However, Deputy DeChellis testified he knew while he was at the Courthouse that Defendant was in custody and that Defendant's girlfriend was in custody, or at least under detention. (TR. 26.)

Once he was finished at the Courthouse, Deputy DeChellis went to the 132nd and Center area where Defendant was located. (TR. 24.) Deputy DeChellis testified he arrived in the area at least an hour after officers first made contact with Defendant. (TR. 26.) When he arrived, Deputy DeChellis spoke to Deputy Paulison, Deputy Berkshire, and Deputy Marcotte. (TR. 25.) At that time, Defendant was sitting in the back of Deputy Berkshire's cruiser. (TR. 37.) Before arriving at the scene, Deputy DeChellis had not had any contact with Deputy Paulison or Deputy Berkshire. (TR. 30.) When Deputy DeChellis arrived, the officers brought each other up to date about the situation, including information about how contact was made with Defendant and the detonation

9

of the boxes at the Courthouse. (TR. 25.) At that time, Deputy DeChellis told the other officers that there was no indication there were bombs in the boxes at the Courthouse. (TR. 25-26.) Deputy DeChellis testified he does not believe the officers were aware that no bombs were found in the boxes until he arrived. (TR. 26-27.) Deputy DeChellis testified that when he was told they were waiting for a dog, he assumed they were waiting for a drug dog because a marijuana smell was coming from the vehicle. (TR. 32.) Deputy DeChellis testified that when a bomb dog showed up, he did not expect that because, having been at the scene, he knew there was not an explosive device at the Courthouse. (TR. 32.)

Deputy DeChellis testified he believed Deputy Paulison, as the acting supervisor for the Sheriff's Office's road patrol that night, was in charge of the scene. (TR. 32-33.) However, Deputy DeChellis testified it was his call to determine whether a "fresh" felony arrest of Defendant should be made and that is part of the reason he went to the scene where Defendant was located.[5] (TR. 32-33.) Deputy DeChellis testified that a "fresh" felony arrest is an arrest made on an officer's authority, rather than an arrest made after seeking an indictment or arrest warrant. (TR. 28-29.) Deputy DeChellis testified he does not have a computer in his car to type the warrantless arrest affidavit, which is needed for booking, so Deputy Berkshire prepared the arrest affidavit. (TR. 33; TR. 88.) Deputy DeChellis testified he does not typically handle drug cases, and that is why additional people were being called and why the supervisor from the narcotics division was involved in the decision-making process. (TR. 35.)

Deputy Paulison testified that when Deputy DeChellis got to the scene, the discussion amongst the officers changed to the subject of whether they were going to take Defendant and book him for the fresh arrest. (TR. 73.) Deputy Paulison testified that when Deputy DeChellis arrived, the decision was made that Defendant was going to be taken from the scene and booked on charges stemming from the bomb incident. (TR. 73.) Deputy Marcotte testified Defendant was arrested for placing a fake bomb at the Courthouse, which is a felony. (TR. 59.) Deputy DeChellis testified that in addition to being charged with placement of a false bomb, Defendant was charged with obstruction of government operations, which is a misdemeanor. (TR. 34.) Deputy Paulison

---

[5] Deputy Marcotte testified Deputy Paulison made the decision to make a fresh felony arrest of Defendant. (TR. 59.) Deputy Marcotte further testified Defendant was immediately arrested by Deputy Paulison for placing a fake bomb at the Courthouse. (TR. 59.)

10

testified that Defendant was not arrested on drug charges at that time but was arrested for that later in the evening by narcotics investigators. (TR. 74; TR. 81.)

Because it was taking some time for the bomb dog to arrive, Deputy DeChellis suggested that Ms. Gillett be released, which she was. (TR. 25.) Deputy DeChellis testified that because Defendant was a fresh felony arrest for placement of a false bomb, he did not see the same issue of detaining Defendant while waiting for the dog. (TR. 25; TR. 34.) Deputy Paulison testified he only had minimal interaction Ms. Gillett at the scene. (TR. 77.) Deputy Paulison testified that he only spoke to her a couple times just to identify her and decide what involvement, if any, she had with Defendant. (TR. 77.) Deputy Paulison estimated that Ms. Gillett was detained for approximately an hour. (TR. 80.) Deputy Paulison testified that Ms. Gillett was released because Deputy DeChellis had no indication she was involved with the bomb situation. (TR. 77; TR. 80.)

Officer Marcotte testified that the bomb dog arrived approximately an hour after it was called and then ran around the F-150. (TR. 52.) The dog did not alert for explosives. (TR. 53.) When the dog did not alert for explosives, officers opened the door of the F-150 and conducted a warrantless search of the F-150. (TR. 53.) Deputy Marcotte testified he does not recall if he made the decision to search the F-150 without a warrant or if another officer made that decision, but that he felt a warrantless search was justified based on everything that was going on and the arrest. (TR. 53.) Deputy Marcotte testified he believes he spoke with Deputy DeChellis and Deputy Paulison and they agreed they could search the F-150 at that time. (TR. 53.) Deputy Marcotte testified he did not think they needed a warrant because they could smell marijuana through a partially opened passenger side window, saw a large amount of money on the driver's side, and Defendant was under arrest for placing a fake bomb.[6] (TR. 60.) Deputy Paulison testified that at that point Defendant was arrested, officers did not need a warrant to search the F-150. (TR. 73.) Deputy Paulison testified that the officers as a group decided based on the information and that his arrest was being made, they were going to search the F-150 incident to arrest. (TR. 74.) Deputy Paulison testified that he was involved in the search, along with Deputy Marcotte and Deputy DeChellis. (TR. 75.) Deputy Berkshire testified he was not involved in the search. (TR. 89.)

---

[6] Officer Marcotte testified that he believed a warrantless search of the F-150 was also a justified "inventory" search incident to arrest, as well as an inventory search before the F-150 would be towed. (TR. 60.)

11

Deputy Marcotte testified he did not observe any officers search the F-150 before he did. (TR. 61.)

Deputy Marcotte testified that when officers opened the back door of the F-150, they got a strong smell of marijuana. (TR. 53.) Officers then opened one of the totes in the F-150 and saw a large amount of marijuana and THC items. (TR. 53; TR. 75.) Deputy Paulison testified that immediately after opening the driver's door, they also located a carboard box full of currency. (TR. 75.) The officers did not know how much currency there was, so it was taken to Deputy Paulison's cruiser. (TR. 75.) The video camera in the cruiser was turned to face the box of currency and the currency was locked in the back seat. (TR. 75.)

Deputy Marcotte testified that after the officers conducted a brief search of the F-150 at the scene, it was determined, based on the amount of items in the F-150, that the F-150 should be towed to the Sheriff's Office for a more thorough search. (TR. 53-54; TR. 76.) Deputy DeChellis testified that they were not located in a setting in which officers would normally pull large amounts of narcotics out of a vehicle. (TR. 33.) Deputy DeChellis stated that officers would normally just do a roadside search based on probable cause, but, in this instance, officers could tell that there was too much narcotics in the vehicle to do it alongside the road. (TR. 33.) Therefore, the officers discussed whether they would need a warrant to search the F-150 if they were to tow it to a separate location to conduct the search. (TR. 33.) Deputy DeChellis testified that the F-150 was brought to the Sheriff's department for the search based on probable cause stemming from the odor of marijuana coming from an open window. (TR. 35.)

## DISCUSSION

Defendant requests that the Court suppress all statements and physical evidence obtained as a result of Defendant's encounter with law enforcement on September 18, 2020 and the subsequent search warrants for his home and personal property. Defendant argues the evidence should be suppressed because law enforcement did not have probable cause to stop his vehicle, if a stop occurred.[7] Defendant also argues officers did not have probable cause to arrest him without a warrant or to search his F-150 without a warrant. Defendant further contends that any evidence

---

[7] The evidence offered at the evidentiary hearing shows that a traffic stop did not occur. Therefore, this argument will not be addressed in this Findings and Recommendation.

from the search warrants that were executed on his home and personal property should be suppressed because the applications for the search warrants relied on evidence that was illegally obtained from Defendant's warrantless arrest and the warrantless search of his F-150. The Court finds Defendant's arguments unpersuasive.

### 1. Arrest

"A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013). "Probable cause to make a warrantless arrest exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (internal quotation omitted).

To determine whether an officer had probable cause to arrest an individual, courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Winarske*, 715 F.3d at 1066 (quotation omitted). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Id*. at 1067. "Instead, the mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *Id*. (internal quotation omitted).

Law enforcement officers are given "substantial latitude in interpreting and drawing inferences from factual circumstances." *Id*. at 1067 (quotation omitted). Moreover, circumstances known to one officer may be imputed to other officers if they are working together on an investigation and there is "some degree of communication" between them. *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011). Under these circumstances, the officers' "collective knowledge" forms the basis of the acting officer's reasonable suspicion or probable cause. *Id*. at 703–04. An officer may become a member of an investigation team when he is instructed to conduct a traffic stop even if he does not possess "all the relevant collective knowledge of the team." *Id*. at 704.

13

Defendant's arrest was supported by probable cause. Suspicious packages were intentionally left at the back of the Courthouse by a service entrance. Law enforcement interpreted the situation as a potential bomb threat and began investigating the situation, which involved an examination of video footage. The video footage showed the individual who left the subject packages at the Courthouse. Through review of this footage and discussions with individuals at the Courthouse, Defendant was identified as the individual shown in the video. The video shows that Defendant had been in Court earlier in the day and had been disruptive during his court proceeding. When Defendant left the Courthouse, shortly before placing the boxes on the sidewalk, he knocked over a no smoking sign. The video footage shows that when Defendant got to his car, he did something in the backseat of the driver's side of his vehicle. After Defendant left his parking spot, he stopped in the intersection, got out of his car, and did something else in the back area of his vehicle on the driver's side. Once Defendant pulled up to the sidewalk on the back side of the Courthouse, he retrieved the boxes he placed on the sidewalk from the backseat on the driver's side of his vehicle. Defendant is the registered owner of the same type of vehicle used to drop the packages off on the sidewalk.

After identifying Defendant, Deputy Marcotte traveled to the residence which he believed belonged to Defendant and observed a male and female arrive at the residence and then engage in suspicious activity. Deputy Marcotte observed the individuals hurriedly removing duffel bags and totes from the residence and placing them in the F-150. As the F-150 departed the residence, Deputy Marcotte identified the male as Defendant and directed uniform patrol to stop the F-150. Shortly thereafter, Deputy Paulison observed the F-150 parked in a parking lot. Deputy Paulison then approached Defendant and Defendant provided his identification. Based on the totality of information known to officers at the time, it was reasonable to conclude Defendant was involved in criminal activity. Therefore, Defendant's warrantless arrest did not violate his constitutional rights.

2.  **Search of the F-150**

Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quotation omitted). "In the case of a warrantless search, the government bears the burden

of establishing an exception to the warrant requirement." *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). One of the exceptions to the warrant requirement is the automobile exception, which permits officers to search a vehicle "if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (internal quotation omitted). Another exception is the search incident to a lawful arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Officers may search a vehicle incident to arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 556 U.S. at 351 (emphasis added). In this case, the government claims each of these exceptions to the warrant requirement are applicable.[8] The Court agrees.

### A. Automobile Exception

Under the automobile exception, officers may search a vehicle if they have probable cause to believe the vehicle contains evidence of criminal activity. *Davis*, 569 F.3d at 816. "Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Keck,* No. 19-3534, 2021 WL 2655062, at * 2 (8th Cir. June 29, 2021) (citation omitted). "Probable cause exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (internal quotation omitted). If probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (quotation omitted).

Here, the totality of the circumstances shows that there was a fair probability that contraband or evidence of a crime would be found in the F-150. Defendant was identified as a suspect in the bomb incident at the Courthouse. Defendant was aware he was wanted in connection

---

[8] The government argued in its brief and somewhat at the evidentiary hearing that the search of the F-150 was also justified by the inventory search exception to the Fourth Amendment's warrant requirement. This exception "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). "An inventory search is reasonable and constitutional if it is conducted according to standardized police procedures." *Id*. To the extent the government made this argument, the Court finds it without merit as the government offered no evidence as to standardized police procedures used to inventory vehicles.

15

with the incident. Defendant's attorney contacted Defendant and indicated to law enforcement that Defendant would turn himself in the following day. However, Deputy Marcotte went to Defendant's residence and observed Defendant moving duffle bags and totes in a hurried fashion into the F-150. Deputy Marcotte testified that he was concerned explosives or something related were being loaded into the F-150. Due to the temporal proximity of events, it was certainly reasonable for officers to conclude that contraband or evidence related to a crime would be found in the F-150.

In addition to evidence related to the bomb incident, the totality of the circumstances shows there was a fair probably that evidence related to drug activity would be found in the F-150. As officers were waiting for the bomb dog to arrive, they walked around the F-150 and conducted a plain view look inside the passenger compartment. Deputy Marcotte testified that one of the windows of the F-150 was down so he could smell the odor of marijuana coming from the passenger side of the F-150. Deputy Paulison testified that, based on his training and experience, the odor of marijuana indicated there might be some illegal narcotics in the vehicle. *See United States v. Mayfield*, 678 F.App'x 437, 439 (8th Cir. 2017) (stating that "the odor of marijuana emanating from a vehicle provides probable cause to search the vehicle pursuant to the automobile exception"); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000), ("[T]he smell of marijuana gave the deputy probable cause to search Peltier's truck for drugs.").

Moreover, Deputy Marcotte testified that while looking inside the F-150, he observed a cardboard box on the driver's side seat and a large amount of U.S. currency in rubber banded bundles. Deputy Paulison likewise testified he saw a box sitting on the front seat with a large amount of currency. Deputy Marcotte stated that, based on his training and experience, a large amount of money is an indication that there could be drugs in the vehicle. *See U.S. v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) (stating that "[p]ossession of a large sum of cash is 'strong evidence' of a connection to drug activity" and that "bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking"). Based on the totality of the circumstances, there was probable cause to search the F-150 without a warrant under the automobile exception.[9]

---

[9] After the officers conducted a brief search of the F-150 at the scene, it was determined, based on the amount of items found in the F-150, that the F-150 should be towed to the Sheriff's Office for a more thorough search. The fact that a

16

### B. Search Incident to Arrest

Police may search a vehicle incident to arrest if it is reasonable to believe the vehicle contains evidence of the offense of arrest. *Gant,* 556 U.S. at 351. As discussed above, in the present case, it was objectively reasonable to believe the F-150 contained evidence of the offense of arrest. Defendant was arrested on charges stemming from the bomb incident at the Courthouse. Thorough video footage and discussions with individuals at the Courthouse, Defendant was identified as the individual suspected in the bomb threat. Following his identification, Deputy Marcotte testified he went to an address believed to be Defendant's residence and observed a male, subsequently identified Defendant, hurriedly move in and out of the residence removing black totes and duffle bags and placing them in the F-150. Deputy Marcotte testified that he was concerned explosives or something related were being loaded into the F-150. Based on the information known to officers, it was objectively reasonable to believe that the F-150 contained evidence related to the incident at the Courthouse.[10]

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian C. Buescher that Defendant's Motion to Suppress (Filing No. 32) be denied.

Dated this 26th day of July, 2021.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

---

full search of the vehicle was not done at the scene, but done at another location, is of no consequence. *See California v. Acevedo,* 500 U.S. 565, 570 (1991) ("[I]f the police have probable cause to justify a warrantless seizure of an automobile they may conduct either an immediate or a delayed search of the vehicle"); *United States v. Soderman,* 983 F.3d 369, 376 (8th Cir. 2020) ("The automobile exception continues to apply to impounded vehicles when an immediate search could have been conducted on the scene.").

[10] Defendant argued in his motion and brief that evidence obtained through subsequent search warrants should also be suppressed because the warrants were obtained using evidence gained through his September 18, 2020 arrest and the search of the F-150. However, because Defendant's arrest and the search were supported by probable cause, this argument fails and will not be addressed further in this Findings and Recommendation.

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.