IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                       Plaintiff,<br><br>    vs.<br><br>THOMAS J. TROUBA,<br><br>                     Defendant. | **8:20-CR-316**<br><br>**MEMORANDUM AND ORDER ON CRIMINAL FORFEITURE** |

## I.    INTRODUCTION

This matter is before the Court after conducting a criminal forfeiture hearing pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(B). At issue at the hearing was whether property described in the Forfeiture Allegation of the Indictment, Filing 1, and the Bill of Particulars, Filing 41, is subject to forfeiture under 21 U.S.C. § 853. Having considered the parties' evidence and arguments, for the reasons stated herein the Court concludes that some of the property at issue is subject to criminal forfeiture.

The Court concludes that the following property shall be forfeited: Defendant Thomas Trouba's residence at 13475 Elm Circle, Omaha, Nebraska 68144; $1,000 in cash seized from Trouba's person; $414,978 in cash found in Trouba's Ford F-150 pickup truck; the balance— alleged to be $4,602.99—of Trouba's Venmo account; $3,594.86 from Trouba's U.S. Bank checking account; and $8,844.89 from Trouba's U.S. Bank savings account.

The Court concludes that the following property shall not be forfeited: three checks totaling $24,083.44 from Caroline Benson, Trouba's friend, that were deposited into Trouba's savings account; five checks totaling $710.00 from Kristine Benson, Caroline's mother, deposited into Trouba's checking account; a $250.00 Visa Direct deposit into Trouba's checking account from

an individual with the username "trouba3;" and a $17.29 deposit into Trouba's checking account from Acorns Investing.

## II.   BACKGROUND

### A. Procedural History

On November 20, 2020, the Government filed a two-count Indictment against Trouba. Filing 1. The Indictment alleged that Trouba (1) conspired to distribute and possess with intent to distribute a mixture or substance containing marijuana, a mixture or substance containing tetrahydrocannabinol (THC), and a mixture or substance containing 3,4-methylenedioxymethamphetamine, in violation of 21 U.S.C. §§ 841, 846; and (2) possessed with intent to distribute a mixture or substance containing marijuana, a mixture or substance containing THC, and a mixture or substance containing 3,4-methylenedioxymethamphetamine, in violation of 21 U.S.C. § 841. Filing 1 at 1–2. The Indictment also included a Forfeiture Allegation, which listed property allegedly subject to criminal forfeiture under 21 U.S.C. § 853. Filing 1 at 2–3. On May 4, 2021, the Government filed a Bill of Particulars alleging that additional property was subject to forfeiture. Filing 41 at 1.

On July 21, 2022, United States Magistrate Judge Susan M. Bazis held a change-of-plea hearing. Filing 87 (Text Minute Entry). Pursuant to his Rule 11(c)(1)(C) plea agreement, Trouba pleaded guilty to Count I of the Indictment. Filing 87 (Text Minute Entry); Filing 95. As part of the plea agreement, the Government and Trouba agreed that the Court would adjudicate the forfeitability of the property described in paragraph 2 subsections (a), (b), (e), (g), and (h) of the

Forfeiture Allegation in the Indictment and the property described in paragraph 2(a) of the Bill of Particulars.[1] Filing 92 at 1. That property is as follows:

1. Approximately $1,000 in United States currency, seized on or about September 18, 2020, from Trouba's person;

2. Approximately $414,978 in United States currency, seized on or about September 18, 2020, from Trouba's Ford F-150 pickup truck, in Omaha, Nebraska;

3. Real property known as Parcel #1511941680, Kingswood Estates Lot 339 Block 0 Irreg, an addition to the City of Omaha, as surveyed, platted, and recorded in Douglas County, Nebraska, which currently has an address of 13475 Elm Circle, Omaha, Nebraska 68144;

4. Approximately $4,572.15, from a U.S. Bank checking account with an account number ending with 4347;

5. Approximately $32,928.33, from Trouba's U.S. Bank savings account with an account number ending with 2944, closed on September 29, 2020, the balance in said account having been converted to a cashier's check payable to Trouba and subsequently deposited in a U.S. Bank account with an account number ending in 4352, a law firm trust account; and

6. Approximately $4,602.99 in United States currency seized on or about December 22, 2020, from Venmo Account No. 17566165.

Filing 1 at 2–3; Filing 41 at 1.

---

[1] The Government agreed to dismiss paragraphs (2)(c), (2)(d), and (2)(f) of the Forfeiture Allegation because the property listed in those paragraphs had been administratively forfeited, as well as paragraph (2)(i), which sought a personal money judgment. Filing 92 at 1.

The Court scheduled an evidentiary hearing regarding the forfeiture issue for October 31, 2022. Filing 93 (Text Order). On October 31, 2022, an evidentiary hearing was held before the undersigned judge.

### B.  Factual Background

On September 18, 2020, Nebraska law enforcement learned of a bomb threat at the Douglas County Courthouse. Filing 50 at 9–10. As part of the investigation into the bomb threat, Deputy Adam Marcotte of the Douglas County Sheriff's Office drove to Trouba's address at 13475 Elm Circle in an unmarked vehicle. Filing 50 at 44.

Deputy Marcotte arrived at Trouba's address and observed Trouba and a woman later identified as Caitlin Gillett removing large totes and duffel bags from Trouba's residence and loading them into a silver 2013 Ford F-150. Filing 50 at 46. Trouba then entered the Ford F-150 and drove away with Gillett following behind in a Dodge Dart. Filing 50 at 46. After driving a few minutes, Trouba and Gillett stopped in a parking lot where Douglas County Sheriff's Office deputies approached them and requested that Trouba and Gillett identify themselves. Filing 50 at 67. Once Trouba provided identification, deputies handcuffed him. Filing 50 at 67, 85. After arresting Trouba, deputies found $1,000 in United States currency from a brown leather wallet on Trouba's person. Ex. 12 at 102.

Later, investigators searched the Ford F-150. Joshua Echtinaw, a deputy at the Douglas County Sheriff's Office and task force officer with the Drug Enforcement Agency (DEA), testified at the evidentiary hearing about what investigators found. Deputy Echtinaw testified that investigators discovered various forms of marijuana and THC in the large totes and duffel bags that Trouba and Gillett had loaded into the truck. Investigators also located a cardboard box in the truck containing large denomination bills wrapped in rubber bands next to THC vapes and yellow

tins of THC shatter.[2] Ex. 12 at 20–21. An official count determined the total value of the United States currency in the cardboard box to be $414,978. Deputy Echtinaw testified that some of the marijuana and THC products found in the vehicle indicated that Trouba had manufactured them. For example, Deputy Echtinaw stated that the THC shatter in the yellow tins was still on wax paper and appeared to have been placed into the tins and that some THC products were in Pyrex or glass containers.

After completing the search of the truck, Deputy Echtinaw obtained a search warrant for Trouba's residence on Elm Circle. On September 19, 2020, officers executed the search warrant. During the search, investigators noticed multiple surveillance cameras in the house, including cameras pointing at the front door and the basement, as well as keypad door locks on the basement door, a door to a room in the basement, and a door to the home office. *E.g.*, Ex. 8 at 3–4, 17, 123. In the home office, investigators discovered packaging materials for marijuana products, a magnetic stirrer, and a scale.[3] Ex. 58–69. Investigators also located THC products throughout the house. At the evidentiary hearing, Deputy Echtinaw testified that the search of the house indicated that Trouba was using it for processing various narcotics.

After investigators listened to a phone call by Trouba from the Douglas County Corrections Center to Gillett—in which Trouba told Gillett to retrieve cash from a hidden compartment in his kitchen sink cabinet—a second search warrant was obtained for Trouba's residence. Investigators executed the second search warrant on September 23, 2020. During the search, investigators found more containers consistent with drug packaging and the hidden compartment mentioned by Trouba

---

[2] As Deputy Echtinaw explained, THC shatter is a cannabis extract made by heating cannabis with butane, pouring the extract in a separate container, and freezing it.

[3] Although Deputy Echtinaw testified that the scale in the office is a magnetic stirrer, having viewed the photographs of items in the home office the Court finds that it is a scale. *See* Ex. 8 at 62–63 (showing that the device has a label with the words "iBALANCE," "MyWeigh," and includes a weight limit).

during his phone call with Gillett. Ex. 10 at 41–43.  They also discovered that the basement stairs were modified so that they could be lifted to reveal a hidden storage area that had additional narcotics. Ex. 10 at 48. Meanwhile, investigators executed a search warrant for Gillett's apartment, in which they found the cash Gillett retrieved from Trouba's house and Trouba's checkbook for a U.S. Bank checking account with an account number ending in 4347.

Jared Dorland, a special agent of the DEA, testified at the evidentiary hearing. During the investigation into Trouba, Agent Dorland listened to phone calls Trouba made from the Douglas County Corrections Center to various individuals. In a September 24, 2020, phone call with his brother Joe Trouba, Trouba stated that their mother was being difficult about moving money out of his U.S. Bank account, to which Joe responded that their mother did not want to get into trouble. Ex. 2. Trouba also called two of his friends, Justin Norman and Rachel Lash, during which Trouba discussed assigning power of attorney to his lawyer, transferring money from his U.S. Bank account to his lawyer, and potential legitimate sources of income for his money. Ex. 3; Ex. 4. Trouba explained on his call with Lash that the reason he transferred money to his lawyer was because law enforcement "can't touch a lawyer." Ex. 4.

Dorland testified that based on these phone calls and the discovery of Trouba's U.S. Bank checkbook, investigators procured subpoenas for information from U.S. Bank and obtained a restraining order to restrain the founds in Trouba's U.S. Bank checking account. While speaking with a U.S. Bank representative, investigators learned that Trouba had a U.S. Bank savings account with an account number ending in 2944 that had been closed and converted into a cashier's check in Trouba's name. The cashier's check had been given to Trouba's attorney, who had deposited it into a client trust account.

Dorland further testified that U.S. Bank provided account statements to investigators that recorded account transactions back until June of 2016. Ex. 14. These statements showed deposits to Trouba's U.S. Bank accounts from, among other sources, Trouba's account on Venmo, a mobile phone-based peer-to-peer application that facilitates monetary transactions between persons. The transaction history of Trouba's Venmo account showed that it had received approximately $67,000 from transfers into the account and approximately $30,000 had been transferred out of the account. Ex. 16. The transfers into the Venmo account came from 26 unique individuals. Dorland averred that investigators confirmed that some of these individuals had drug-related criminal histories. Investigators also searched Trouba's phone, which had communications with drug customers on it through which Trouba and the customer would discuss payment, including payment via Venmo. Some of the communications utilized the TextNow application, which Dorland testified is commonly used within drug distribution networks.

Paul Orduna, a financial investigator at the DEA office in Omaha, testified at the evidentiary hearing about conducting a tracing analysis on Trouba's U.S. Bank accounts to separate Trouba's legitimate funds from the funds he procured through drug trafficking. Ex. 18 at 1–44. The tracing analysis states that Trouba's legitimate income came from his approximately $300-per-week salary from Marriott international,[4] checks from insurance companies, returned funds from the Douglas County Jail, and interest. The tracing analysis listed illegitimate income as cash deposits, peer-to-peer transfers from applications like Venmo and Visa Direct, and checks from individuals Orduna determined had drug-related criminal histories. After performing the tracing analysis, Orduna concluded that $4,572.15 in Trouba's checking account and $32,928.33 in Trouba's savings account were proceeds of Trouba's drug offense. Ex. 18 at 44.

---

[4] Trouba also received $81.44 in payroll from Skip The Dishes once in April of 2017.

Caroline Benson, Trouba's friend, testified at the evidentiary hearing for the defense. Benson testified that she had known Trouba for about six years and rented a space in his residence from November of 2017 to around May of 2020. She explained that her rent was anywhere between 600 to 800 dollars a month, and that she paid her rent partially through settlement checks she received annually from Symetra Financial. Caroline stated that she gave these checks to Trouba both to secure a roof over her head and for him to hold for her to keep her from spending it. Caroline further stated she had the checks sent to Trouba because Caroline did not have a bank account. During cross examination, Caroline admitted that she never signed a lease with Trouba and had no documentation showing that she was renting from him. There was also testimony during the evidentiary hearing that Caroline helped Trouba distribute drugs to customers, and she disclosed during cross examination that she was aware that Trouba was selling marijuana and THC products.

Rachel Lash, another of Trouba's friends, also testified for the defense at the evidentiary hearing. Lash testified that after her father passed away, he told her to retrieve $100,000 from a crawl space in his house and to put it in a safe place. Lash further testified that she gave the cash to Trouba on around September 11, 2020—seven days before Trouba's arrest—because he had a safe and she was afraid to deposit it in a bank. Lash claimed that the $414,978 seized from Trouba's truck included her $100,000 cash but conceded that she had no proof supporting that claim.[5]

---

[5] Julie Russell, Lash's mother, also testified for the defense that she was present when Lash retrieved money from the crawl space in Lash's father's house, although she admitted that she did not know how much Lash retrieved or where Lash put it. Trouba also briefly testified but did not state anything relevant to the forfeiture issue.

### III.   ANALYSIS

### A.  Standards for Criminal Forfeiture under 21 U.S.C. § 853

Criminal forfeiture "is an element of the sentence imposed following conviction or . . . a plea of guilty . . . .". *Libretti v. United States*, 516 U.S. 29, 38–39 (1995). Both Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853 govern criminal forfeiture for drug offenses. Under Rule 32.2, a court must determine the forfeitability of property "[a]s soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought . . . .". Fed. R. Crim. P. 32.2(b)(1)(A). To determine the forfeitability of property, a court may base its determination "on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). Because the evidence need only be "relevant and reliable," and because criminal forfeiture is an aspect of sentencing, *see Libretti*, 516 U.S. at 38–39, the Federal Rules of Evidence do not apply. *See United States v. Smith*, 770 F.3d 628, 640–41 (7th Cir. 2014) (holding that the Federal Rules of Evidence did not apply at the defendant's criminal forfeiture hearing).

When the Government seeks to forfeit specific property, it must establish, by a preponderance of the evidence, "the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A); *see United States v. Bieri,* 21 F.3d 819, 822 (8th Cir. 1994) (adopting the preponderance of the evidence standard for criminal forfeiture cases under 21 U.S.C. § 853). The "requisite nexus" for forfeiture in a drug-distribution case requires the Government to show that the property constituted, or was derived from, "any proceeds the person obtained, directly or indirectly, as the result of [a drug offense]," or that the property was "used, or intended to be used,

in any manner or part, to commit, or to facilitate the commission of [a drug offense]." 21 U.S.C. § 853(a)(1)–(2); *see also United States v. Sheley*, 998 F.3d 349, 351 (8th Cir. 2021) ("For the property to be subject to forfeiture, the government was required to establish by a preponderance of the evidence that the [property] (1) constituted or derived from proceeds [the defendant] obtained, directly or indirectly, as a result of her drug-related offenses, or (2) was used or intended to be used in any manner to commit or to facilitate drug-related offenses." (citing 21 U.S.C. § 853(a)(1)–(2)).

To be subject to forfeiture, there must be a "substantial connection"[6] between the property and the underlying offense. *See United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004); *cf. United States v. Hull*, 606 F.3d 524, 527–28 (8th Cir. 2010) (stating that the evidence should show a "substantial connection" between the property and the offenses under the statute governing criminal forfeiture in a child pornography offenses). "[T]here must be 'something more than an incidental or fortuitous contact between the property and the underlying illegal activity, although the property need not be indispensable to the commission of' the offense." *United States v. Lewis*, 987 F.2d 1349, 1356 (8th Cir. 1993) (quoting *United States v. Premises Known as 3639–2nd Street, N.E., Minneapolis, Minnesota*, 869 F.2d 1093, 1096 (8th Cir. 1989)). In making this determination, the court "consider[s] the totality of the circumstances, applying common sense

---

[6] The "substantial connection" language appears in the statute governing civil forfeiture under 18 U.S.C. § 983(c)(3), *see* 18 U.S.C. § 983(c)(3) (requiring the Government to "establish that there was a substantial connection between the property and the offense"), but does not appear in 21 U.S.C. § 853, the statute governing criminal forfeiture in drug-distribution cases. The Eighth Circuit has not expressly applied the "substantial connection" requirement in criminal forfeiture cases under § 853, but the Court finds that the "substantial connection" requirement would apply here. First, other circuits have applied the "substantial connection" standard to criminal forfeitures under § 853. *See United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010); *United States v. Smith*, 966 F.2d 1045, 1055 (6th Cir. 1992). Second, the Eighth Circuit in *United States v. Hull* applied the "substantial connection" standard to a forfeiture allegation in a child pornography case that was governed by 18 U.S.C. § 2253, even though § 2253, like 21 U.S.C. § 853, lacks the "substantial connection" language. *See Hull*, 606 F.3d at 527. Given that other circuits have applied the "substantial connection" standard to criminal forfeiture allegations under 21 U.S.C. § 853, and the fact that the Eighth Circuit has applied that standard to a proceeding governed by a different criminal forfeiture statute, the Court will apply that standard in this case.

considerations." *United States v. $48,100.00 in U.S. Currency*, 756 F.3d 650, 653 (8th Cir. 2014).
"A court may consider circumstantial evidence when conducting a totality-of-the-circumstances
review in a forfeiture proceeding." *United States v. $63,530.00 in U.S. Currency*, 781 F.3d 949,
955 (8th Cir. 2015).

### B.   Analysis

The property at issue includes Trouba's residence, cash found on his person and in his Ford
F-150 after deputies arrested him for making terroristic threats, and funds in Trouba's bank account
and his Venmo account. In general, the Government argues that Trouba's residence facilitated his
drug-trafficking enterprise and the United States currency found on Trouba's person, in his Ford
F-150, and in his accounts are proceeds of his drug-trafficking offense. Filing 107 at 6–9. At the
October 31, 2022, evidentiary hearing, Trouba argued that there was insufficient evidence that his
residence facilitated his drug trafficking and that investigators were making unsupported
assumptions about the source of his income. Having reviewed the evidence in the record, including
Trouba's plea agreement, and all other "relevant and reliable" evidence offered by the parties and
accepted by the Court, Fed. R. Crim. P. 32.2(b)(1)(B), the Court makes the conclusions outlined
below.

#### 1.   *Trouba's Residence*

The Court begins with the forfeitability of Trouba's residence. The Government argues
that Trouba's residence "obviously" facilitated his drug-trafficking enterprise and, therefore, it is
subject to forfeiture under 21 U.S.C. § 853(a)(2). Trouba responded at the evidentiary hearing that
the Government failed to show that the cameras in residence and the locks on his doors were not
installed by the residence's former owner. The Court agrees with the Government that Trouba's
residence is forfeitable.

Property used or intended to be used in any manner to commit or to facilitate a drug-related offense is subject to forfeiture. *See Sheley*, 998 F3d. at 351. Property facilitates a drug-related offense when it makes "the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 843 (8th Cir. 2007) (internal quotation marks omitted) (quoting *Premises Known as 3639–2nd St., N.E., Minneapolis, Minn.*, 869 F.2d at 1096). "[I]f a defendant uses any part of a piece of property to commit or to facilitate a drug offense, the district court is required to forfeit the whole property." *See Bieri*, 21 F.3d at 824. Mere suspicion that the defendant used or intended to use the property to commit a drug-related offense does not support forfeiture. *See United States v. One 1976 Ford F-150 Pick-Up VIN F14YUB03797*, 769 F.2d 525, 527 (8th Cir. 1985); *United States v. Hassan*, 439 F.Supp.2d 903, 909 (E.D. Ark. 2006).

In this case, the Government has proved, by a preponderance of the evidence, that Trouba used his residence to facilitate the commission of his drug-distribution offense. Using property to store, manufacture, and package drugs will subject it to forfeiture. *See Bieri*, 21 F.3d at 821 (holding that property was forfeitable when marijuana, cash, a loaded gun, brown wrapping material, and other drug paraphernalia were found in buildings on the property); *Premises Known as 3639-2nd St., N.E., Minneapolis, Minn.*, 869 F.2d at 1096–97 (8th Cir. 1989) (holding that a house was subject to forfeiture because "the mere use of the house for drug storage and concealment clearly made the sale of cocaine less difficult"); *see also United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005) (holding that the storage of narcotics on the property supported a finding that the property facilitated a drug crime). That Trouba's residence made drug distribution "less difficult or more or less free from obstruction or hindrance" cannot be seriously disputed. *Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d at 843. The record

shows that Trouba used his residence to store and package large quantities of narcotics and manufacture THC products. Investigators located packaging materials, a scale, and a stirrer in Trouba's residence, all of which are consistent with the packaging and production of narcotics. The installation of cameras and number-pad locks helped protect and conceal Trouba's drug distribution and manufacturing enterprise. *Cf. Hull*, 606 F.3d at 527–28 (holding, under the child pornography criminal forfeiture statute, that the defendant's residence was forfeitable because, *inter alia*, the use of a computer in the residence "made it easier for [the defendant] to conceal his crimes from public scrutiny"). Indeed, the record shows that Trouba modified his home to make it easier to store and hide drugs and the proceeds of drug sales, such as creating secret compartments beneath his basement stairs and his kitchen sink cabinet. Therefore, the Court concludes that Trouba's residence is subject to forfeiture under 21 U.S.C. § 853(a)(2) for facilitating Trouba's drug-distribution offense.

2. *$414,978 Seized from Trouba's Ford F-150 Pickup Truck and $1,000 Seized from Trouba's Person*

The Court next addresses whether the $414,978 in United States currency seized from Trouba's Ford F-150 Pickup Truck and the $1,000 in United States currency seized from Trouba's person is subject to forfeiture. According to the Government, this money constitutes proceeds of Trouba's drug-distribution offense. The Government points out that the evidence shows Trouba attempted to empty his house of his drugs and money to either hide it or get rid of it in some way.

21 U.S.C. § 853(a)(1) renders any property forfeitable that constitutes "proceeds the person obtained, directly or indirectly, as the result of [a drug crime]." 21 U.S.C. § 853(a)(1). The Government does not need to prove that the proceeds are "linked to any particular drug transaction," *see $48,100.00 in U.S. Currency*, 756 F.3d at 655, but the proceeds must still "be

13

traceable to the offense." *United States v. Tolliver*, 949 F.3d 244, 249 (6th Cir. 2020). If the Government shows by a preponderance of the evidence that Trouba obtained money from his drug-dealing activity, then that money is subject to forfeiture. *See United States v. Gensley*, 859 F. App'x 10, 11 (8th Cir. 2021).

The Court agrees with the Government that the money is forfeitable under 21 U.S.C. § 853(a)(1) as proceeds Trouba obtained from distributing drugs. The large amount of cash in Trouba's truck and on his person—nearly half a million dollars—indicates a connection between the cash and drug activity, especially considering that the cash was located alongside a significant quantity of marijuana and THC products. *See $63,530.00 in U.S. Currency*, 781 F.3d at 955 ("Possession of large amounts of currency provides strong evidence of a connection between the currency and drug activity."); *$84,615 in U.S. Currency*, 379 F.3d at 501–02 (noting, while upholding the forfeiture of nearly $85,000, that the defendant "undisputedly possessed illegal drugs at the time of the money discovery"). Investigators discovered the $414,978 wrapped in rubber bands in a cardboard box next to additional THC products. *See United States v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) ("[W]e have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."); *Gensley*, 859 F. App'x at 11 (holding that $4,300 in cash was forfeitable as proceeds when, *inter alia*, it was found hidden alongside narcotics and drug paraphernalia). The quantity of narcotics found in both Trouba's house and truck is consistent with this significant sum of currency. Indeed, given that the record shows that Trouba's sole source of legitimate income was a job at Marriott—for which he received about $300 per week deposited directly into his bank accounts—the only plausible explanation for where Trouba obtained the bulk currency found in his truck and on his person is

his drug distribution enterprise. *See United States v. Wojcik*, 60 F.3d 431, 434 (8th Cir. 1995) (observing, while holding that $30,577 in cash was forfeitable, that "the money was stored in cash in highly unusual locations despite the fact that defendant had bank accounts for his business"); *see also Tolliver*, 949 F.3d at 249 (noting, in a forfeiture case, that there was "no evidence that [the defendant] had any source of income besides the cuts he got from the money laundering scheme"); *United States v. Patel*, 131 F.3d 1195, 1201 (7th Cir. 1997) ("Once the district court rejected [the defendant's] evidence that the money found in his home was derived from legitimate family businesses, it was reasonable for the court to conclude that the money came from [the defendant's] cocaine dealing."). Finally, Trouba's actions of emptying his house of drugs and money in several duffel and tote bags shortly after making a bomb threat are indicative of him attempting to flee with narcotics and his ill-gotten gains in an effort to evade law enforcement. *See $124,700 in U.S. Currency*, 458 F.3d at 826 (noting, in a forfeiture case, that the circumstances of the defendant's travel were "highly suspicious").

The Court's conclusion that this cash is forfeitable is not altered by the testimony of Lash, who testified that she gave $100,000 in cash to Trouba about seven days before his arrest that she found in a crawl space beneath her late father's house. As an initial matter, there is no evidence that the nearly half-a-million dollars in Trouba's truck and on his person included the supposed $100,000 from Lash. More fundamentally, however, the Court does not find Lash's testimony credible. First, Lash is not a neutral party to this issue, as she had known Trouba for approximately five years, was friends with him, aware of his drug dealing, and believed Trouba's criminal conduct was not serious. During one of her phone calls with Trouba while Trouba was in jail, she discussed with Trouba how to transfer money from one of his bank accounts to keep it from law enforcement. Her story about giving Trouba $100,000 appears to be a similar attempt to protect Trouba's drug-

distribution proceeds. Moreover, despite claiming to have transferred a significant amount of cash to Trouba, she never mentioned this money to Trouba during her phone call with him. Finally, the reason she claims she gave the money to Trouba was because he had a safe, which makes little sense when she could have purchased a safe herself with the $100,000.

The testimony of Julie Russell, Lash's mother, does not bolster Lash's testimony. Even crediting Russell's testimony, she testified that she did not know how much money Lash supposedly recovered from the crawl space and had no idea what Lash did with the money. Moreover, the Court also finds Russell's testimony to lack credibility because it is extremely doubtful that Lash found $100,000 in the crawl space of her father's house shortly before Trouba was arrested and gave that cash to him. The Court considers this story to be fabricated.

Based on the totality of the circumstances, which include, among other facts, the significant amount of currency in Trouba's truck and on his person found alongside an equally significant quantity of narcotics, Trouba attempting to flee with the narcotics and the bulk currency, and the fact that the only plausible source of the cash is Trouba's drug-dealing activities, the Court concludes that the United States has proved by a preponderance of the evidence that the $414,978 seized from Trouba's Ford F-150 Pickup Truck and the $1,000 seized from Trouba's person is forfeitable as drug proceeds under 21 U.S.C. § 853(a)(1).

> 3.  *Funds Seized from Trouba's Checking Account, Savings Account, and Venmo Account*

The Court finally addresses the forfeitability of funds in Trouba's U.S. Bank checking and savings account and Trouba's Venmo Account. The Government argues that the funds in Trouba's accounts are forfeitable as proceeds of Trouba's drug-dealing offense. According to the Government, Trouba used his U.S Bank checking and savings account to store money he earned from drug sales. The Government asserts that Trouba made these sales by utilizing peer-to-peer

16

transaction applications, such as Venmo, or by simply exchanging drugs for cash. At the evidentiary hearing, Trouba generally challenged the Government's ability to trace the funds in his account to his drug-dealing activity and put forward the testimony of Caroline Benson, Trouba's friend, who testified that she gave Trouba her annual settlement checks to pay rent and to keep her from spending it. The Court concludes that the Government has met its burden as to some of the money in Trouba's accounts, but not all of it.

The Government primarily relies on a tracing analysis conducted by Orduna, a DEA financial investigator, to support forfeiting the money in Trouba's U.S. Bank accounts and his Venmo account. At the evidentiary hearing, Orduna explained that he used a lowest intermediate balance rule tracing analysis to determine the source of funds in Trouba's U.S. Bank accounts. Orduna explained that the lowest intermediate balance rule tracing analysis is used in forensic accounting to distinguish between "explained" income—money from a readily identifiable source such as payroll—and "unexplained" income—money from an unidentifiable source such as cash deposits—when both types of funds are commingled in the same account. When money is transferred out of the account, Orduna elaborated, this tracing analysis lowers the balance of the explained income first and, when no explained income remain, begins lowering the balance of the unexplained income.

While conducting this tracing analysis, Orduna generated an Excel spreadsheet with both of Trouba's accounts listed side-by-side and two columns for each account titled "explained income" and "unexplained income." Ex. 18. The spreadsheet lists the explained income as payroll from Marriott International, checks from insurance companies, returned funds from the Douglas County jail, and interest; and lists the unexplained income as cash deposits, peer-to-peer transfers from applications like Venmo and Visa Direct, and checks from individuals with drug-related

criminal histories. Ex. 18 at 1–44. These checks included three checks from Symetra Financial made out to Caroline Benson for large amounts that were deposited in Trouba's savings account and four checks from Kristine Benson, Caroline Benson's mother, deposited in Trouba's checking account. Ex. 18 at 28, 33, 35, 39–40, 42–43. After performing the tracing analysis, Orduna concluded that $4,572.15 in Trouba's checking account and $32,928.33 in Trouba's savings account were proceeds of Trouba's drug offense. Ex. 18 at 44.

The Government also points to evidence showing Trouba used Venmo to engage in drug transactions as further proof the forfeitability of money in Trouba's bank and Venmo accounts. Dorland, a DEA special agent involved in the investigation into Trouba, testified that the transfers into the Venmo account came from 26 unique individuals, some of whom had drug-related criminal histories, and that Trouba had communications with drug customers discussing paying Trouba for narcotics via Venmo. The Government further highlights Trouba's post-arrest draining of his U.S. Bank savings account into a cashier's check and giving that check to his attorney,[7] believing that law enforcement "can't touch a lawyer." Ex. 4. The Government contends that this conduct shows Trouba hiding money from law enforcement because it consisted of drug-crime proceeds.

In response, Trouba argues that Orduna's tracing analysis is unreliable because Orduna mistakenly listed one Visa Direct transaction as "explained" income despite listing every other Visa Direct transaction as "unexplained" income. Ex. 18 at 10. Trouba also points out that Caroline, his friend, testified that she gave him her annual settlement checks for rent and to keep her from spending them.

---

[7] The Government states and the Court finds that there is no evidence that Trouba's attorney had any idea of the source of the funds for Trouba's cashier's check.

a. The Venmo Account and Bank Deposits from Cash and Peer-to-Peer Transaction Applications

Considering the totality of the circumstances and applying common sense considerations, *see $48,100.00 in U.S. Currency*, 756 F.3d at 653, the Court first concludes that the money in Trouba's Venmo account—alleged to be $4,602.99—and the cash, Visa Direct, and Venmo deposits into Trouba's bank account are subject to forfeiture. The evidence shows that Trouba used peer-to-peer transaction applications, such as Venmo and Visa Direct, to execute drug sales. The cash, Venmo, and Visa Direct deposits far exceeded his salary from Marriott and are consistent with the amount of narcotics that Trouba was distributing. *See Tolliver*, 949 F.3d at 249 (noting that there was no evidence that the defendant had any legitimate sources of income and that the amount of money he was gambling skyrocketed once he joined the drug-distribution conspiracy); *United States v. $14,000 in U.S. Currency*, No. 1:15CV1912, 2018 WL 2266865, at *2 (N.D. Ohio Jan. 9, 2018) (pointing out that the claimant had an insufficient legitimate income to account for the amount of the cash seized). Given the quantity of drugs found in Trouba's truck and residence and the scope of Trouba's operation as reflected by evidence in the record, the most plausible source of the money he received via Venmo, Visa Direct, and in cash is his drug-dealing offense.

The Court also finds it significant that Trouba drained his savings account into a cashier's check and gave that check to his attorney. Based on the over-the-phone conversations he was having at that time, it was clear that Trouba was concerned about the Government seizing and forfeiting his funds. Trouba expressly stated that he gave his attorney the cashier's check because he believed it would protect his funds from law enforcement. It is obvious to the Court that Trouba was attempting to hide the money in his savings account from law enforcement because he knew it could be seized by the Government. Accordingly, based on the evidence showing how Trouba

19

executed his drug sales, that Trouba's only source of legitimate income was Marriott, and his post-arrest conduct of trying to hide his funds, the Court concludes that the funds in Trouba's Venmo account and the cash, Venmo, and Visa Direct deposits into Trouba's bank accounts are subject to forfeiture.[8]

### b. Check Deposits

The Court next addresses the deposits into Trouba's accounts from several checks. Except for one check from Kristine Benson, the mother of Caroline Benson, a check from the Douglas County Jail, and checks from insurance companies, Orduna listed every check deposited in Trouba's account as "unexplained" income in his tracing analysis. According to Orduna, the checks designated as "unexplained" income came from people who had criminal histories, most of which involved drugs. Orduna provided specific testimony on two of these individuals: Anthony Bruscato, who had an arrest for cultivating marijuana, and Steven Danon, who had arrests for drugs and had provided marijuana to a victim of one of his offenses.[9]

The Court concludes that most of the checks deposited in Trouba's account are forfeitable. As has been ongoing theme in this order, besides the small income from Marriott, there is no other plausible legal explanation for the money in Trouba's accounts. *See Tolliver*, 949 F.3d at 2020. Trouba was engaged in a significant drug distribution scheme, and the value of the checks subject to forfeiture—which range from $5,000 to $200—are consistent with the size and scope of Trouba's operation. Moreover, Orduna's testimony about the criminal histories of the individuals supplying these checks shows that they had a propensity to purchase narcotics from Trouba.

---

[8] Orduna included a $250 Visa Direct deposit from an individual with the username "trouba3" as "explained" income. Although he testified that he believed this was a mistake, given this inconsistency the Court concludes that this deposit is not subject to forfeiture.

[9] Orduna's tracing analysis also lists the Federal Bureau of Investigation (FBI) numbers for some of the individuals who wrote checks to Trouba. Ex. 18 at 33, 43.

However, the Court concludes that the Government has not met its burden as to the checks from Caroline Benson and Kristine Benson. Caroline Benson testified that she lived with Trouba for approximately two-and-a-half years from 2017 to 2020. During the time she lived with Trouba, Caroline gave Trouba her annual settlement checks for rent and to prevent her from spending the money. These checks were for $7,076.18, $7,996.07, and $9,011.19. Ex. 18 at 26, 35, 43. Caroline stated that she was homeless before she moved in with Trouba, and that these checks ensured that she had a roof over her head. Caroline also testified that she did not have a bank account at the time she did this. After observing her demeanor at the evidentiary hearing and considering her testimony, the Court finds Caroline to be credible. Moreover, unlike the checks written by other individuals and the Visa Direct, Venmo, and cash deposits, there is an explanation for the source of these funds besides Trouba's sale of narcotics that the Government fails to overcome. And while there was testimony that Caroline helped Trouba distribute narcotics, there is no evidence that she wrote these checks to Trouba to purchase narcotics.

The Court has a different issue with the Government's evidence as to the checks from Kristine Benson, Caroline Benson's mother. Kristine wrote five checks to Trouba: one for $140, three for $95, and one for $285. Ex. 18 at 28, 39–40, 42. For unknown reasons, Orduna listed one of the $95 checks as "explained" income and the rest as "unexplained" income. Orduna provided no explanation for this inconsistent treatment. It is not clear to the Court whether Orduna mistakenly included one of the $95 checks as "explained" income, mistakenly listed the other checks as "unexplained" income, or if there is another explanation. Moreover, unlike the other individuals who wrote checks, no FBI numbers accompany the entries for Kristine's checks in Orduna's report, making it unlikely that she has a criminal history.

21

Accordingly, the Court concludes that the Government fails to meet its burden to forfeit the check deposits from Caroline Benson and Kristine Benson, totaling $24,793.44, but has met its burden to forfeit the remaining check deposits.

### c. Acorns Investing Deposit

The Court last addresses a $17.29 deposit from Acorns Investing listed as "unexplained" income in Orduna's tracing analysis report. Ex. 18 at 7. Orduna testified that Trouba's Acorns Investing account appeared to be a side interest. There is no evidence that the account was utilized in Trouba's drug-distribution enterprise. Moreover, as shown in the tracing analysis report, the funds for the Acorns Investing account came from the "explained" income balance, meaning that the account consisted of "explained" funds. Therefore, the deposit from the Acorns Investing account is not forfeitable.

## IV.   CONCLUSION

The Court concludes that the following property is subject to forfeiture: Trouba's residence at Parcel #1511941680, Kingswood Estates Lot 339, which currently has an address of 13475 Elm Circle, Omaha, Nebraska 68144; $1,000 in cash found on Trouba's person; $414,978 in cash found in Trouba's Ford-150 pickup truck; the balance—alleged to be $4,602.99—of Trouba's Venmo account; $3,594.86 from Trouba's U.S. Bank checking account; and $8,844.89 from Trouba's U.S. Bank savings account. The Court will enter a preliminary order of forfeiture accompanying this Order. The parties shall have fourteen (14) days from the date of this Order to suggest revisions or modifications to the preliminary order of forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b)(2)(B).

Dated this 29th day of November, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge